# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| RHONDA CROCKETT, | No. 52541-1-II |
| Appellant, | |
| v. | |
| STATE OF WASHINGTON DEPARTMENT OF SOCIAL AND HEALTH SERVICES, | UNPUBLISHED OPINION |
| Respondent. | |

LEE, J. — Rhonda Crockett appeals the Department of Social and Health Service (Department) Board of Appeal review judge's final order affirming the Department's findings that she committed physical abuse and negligent treatment and maltreatment of her daughter, M-L.[1] Crockett argues that the review judge's final order is not supported by substantial evidence and erroneously interprets or applies the law. We disagree and affirm the review judge's final order.

FACTS

## I.   COMPLAINT AND INVESTIGATION

Crockett is M-L's adopted mother. In August 2013, an anonymous friend contacted law enforcement because M-L had Facebook posts which caused the friend to be concerned that M-L

---

[1] We use the child's first initials to protect her privacy.

had been the victim of sexual abuse.[2] This prompted an investigation from law enforcement and the Department. The assigned social worker, Mara Campbell, wrote a report which included a summary of the information from the investigation:

> [M-L] and [Crockett] reported a physical altercation between them. [M-L] reported her mother assaulted her by hitting her, pulling her hair and squeezing her wrists. She further reported she grabbed her mother during the altercation which made her mother mad. [Crockett] reported her daughter flinched so she hit her on the back of the neck/head and her daughter grabbed her arm so she pulled her hair and pulled her to the ground and grabbed both wrists. She reported hitting her but her daughter blocked her hits to the face with her arms.
>
> [M-L] reported telling her mother her step father sexually abuse[d] her in 2008. A previous intake #2868266 reported sexual abuse by James Crockett. [Crockett] reported her daughter told her about being touched by James in 2008 but stated they decided to handle it as a family. James remained in the home and the "touching" was not reported.

Administrative Record (AR) at 151.[3]

Detective Cynthia Brooks of the Tacoma Police Department was assigned to investigate the case. Detective Brooks's report documented the sexual abuse that M-L disclosed during her interview. In regards to the disclosure M-L made to Crockett, Detective Brooks wrote,

> [M-L] said she told [Crockett] about the touching on Thanksgiving Day 2008. She said she had gone to the store with James to buy something for the dinner and he was yelling at her in the car. James told her that he was her dad now and she said she told him how could he be her dad when he molested her.
>
> She said when they got back home she ran in the house and told [Crockett] that James had been touching her. She said she couldn't take it anymore. She said [Crockett] dropped the silverware when she told her and she said all three of them talked about it. She said James denied touching her at first but then he said he did

---

[2] The Facebook post that triggered the report to law enforcement is not in the appellate record.

[3] For clarity and consistency, we refer to James Crockett by his first name. We intend no disrespect.

it. She said [Crockett] at first said she was going to call the police and then James started crying.

She said [Crockett] and James talked and it was decided that they would pray and get through it as a family. [M-L] said at first she thought maybe [Crockett] didn't believe her, but then James admitted he touched her.

AR at 170.

On September 13, 2013, the Department issued Founded findings on the allegation of physical abuse from the August 2013 incident and the allegation of negligent treatment or maltreatment for failing to report M-L's allegation of sexual abuse on Thanksgiving 2008. The Department's area administrator reviewed the findings and determined they were correct.

II.    ADMINISTRATIVE HEARING

Crockett appealed the Department's findings. An Administrative Law Judge (ALJ) held an administrative hearing to review the Department's findings. M-L, Crockett, Detective Brooks, and Campbell testified at the hearing. Crocket also presented several character witnesses.

1.    M-L's Testimony

During the administrative hearing M-L testified about both the August 2013 incident and the Thanksgiving 2008 disclosure. With regard to the August 2013 incident, M-L testified as follows:

[Assistant Attorney General (AAG)]: Okay. What do you remember about the—the physical altercation or argument with your mom? How did it start?

[M-L]: Um, I remember that my mom came downstairs and, um, told me that I told, um, James, her husband, that I wasn't going to drive her to her doctor's appointment. And, um, she started whooping me.

[AAG]: What—what do you mean? Could you explain it in a little more detail?

      [M-L]: Um, yeah. So, um, she was hitting me in the face, um, and she, um, grabbed my hair. And I fell on the floor to my knees. And she was going to hit me. And I grabbed her arm. And then, um, she yelled, "Hit me. Hit me." And I didn't hit her. And then she just kept hitting me.

          . . . .

      [AAG]: Could you tell the Judge how you were hurt?

      [M-L]: Um, my, um, wrist was, um—it was kind of bruised, and it was, um, aching for a couple of day[s]. And, um, I think that's all.

      [AAG]: Okay. How did the injury to your wrist happen?

      [M-L]: Um, because when she grabbed my arm it kind of twisted, and she dug her nails into my arm.

AR (1 Verbatim Report of Proceedings (VRP)) at 42-43.

When asked what she told Crockett on Thanksgiving 2008, M-L responded, "I told her that, um, 'That he—how can he expect me to respect him when he doesn't respect me. Um, and that he was, um, molesting me." AR (1 VRP) at 46. Then M-L explained,

      Um, [Crockett] questioned James, and um, he denied that, um, he had touched me several times. And then, as she kept asking him, he, um, starting crying and said he did. And so she told him that he was gonna—she was have him call the police on himself. And then, um—and then, um, I was sent out of the room. And when I—when I was called back into the room, um, she said that we were just going to, um, get through it as a family and pray. And, um, if I wanted to call—or if I wanted to go to counseling.

AR (1 VRP) at 47.

On cross-examination, M-L clarified that the bruising on her wrist was light discoloration, and that the injury to her wrist did not prevent her from doing anything, including playing the piano. M-L also stated that following the Thanksgiving 2008 disclosure, Crockett put some safety measures in place and James did not molest her again.

M-L testified on redirect examination that she contradicted James's denial by saying "he had touched me, um, over my clothes." AR (1 VRP) at 66. M-L also testified that she told Crockett that James had touched her "on my breasts and in my private area." AR (1 VRP) at 66.

2.    Brooks's Testimony

Detective Brooks testified about her interview with M-L. Regarding the August 2013 incident, M-L told Detective Brooks that earlier in the day, she and Crockett had gotten into an altercation while M-L was driving. When they got home, M-L told James that she did not want to drive Crockett to an upcoming doctor's appointment. Then Crockett confronted M-L. M-L also told her that Crockett hit M-L with an open hand on the back of the head, punched her in the face and hand, and pulled her hair. M-L's wrist was swollen for a week and a half after the incident. Detective Brooks also stated that, "[M-L] told us that she told her mother—told [Crockett] that, um, James had been touching her, molesting her, on, um, Thanksgiving Day of 2008." AR (2 VRP) at 22.

Detective Brooks also testified about her interview with Crockett. Crockett told her that she took M-L to the floor after M-L grabbed her hands. Crockett also told Detective Brooks that M-L only told her that James had touched her inner thigh, and her stomach by her waist.

3.    Campbell's Testimony

Campbell testified that she was present when Detective Brooks interviewed M-L and Crockett. Campbell also testified that the physical abuse finding was based on M-L's swollen, sore wrist that lasted for longer than 24 hours, and the negligent treatment or maltreatment finding was based on Crockett's failure to report M-L's Thanksgiving 2008 disclosure. Campbell admitted

there were different versions of what was disclosed on Thanksgiving 2008, but she determined it was more likely than not that Crockett knew James was molesting M-L based on M-L's disclosure.

4.    Crockett's Testimony

Crockett testified that in August 2013, she confronted M-L about M-L's decision to not drive Crockett to her doctor's appointment. Crockett began to feel disrespected because M-L was yelling, screaming, and invading her personal space. When Crockett went to hit M-L on the face, M-L put her hands up to block her face. Crockett hit the back of M-L's neck with an open hand. Crockett explained,

> I wanted her to be quiet. I wanted her—at this point she was totally disrespectful. I'm the adult. My husband's the other adult in the house. And I do not tolerate, and did not tolerate my children talking back to me. And then that—that confrontation or that interaction going on, there had never been one like that. And so I was trying to get things under control.

AR (3 VRP) at 22. When M-L grabbed Crockett's hands, Crockett knocked her hands away and grabbed M-L's ponytail. M-L grabbed Crockett's hands again. Crockett then locked both M-L's wrists in one hand, took her pony tail in the other hand, and "put her on the floor." AR (3 VRP) at 28. Crockett testified that it was a safe take down move she had learned to use when necessary to restrain special education students. M-L did not appear to be hurt following the take down. Crockett then stepped away, told M-L to take a bath and go to bed.

Crockett admitted that on Thanksgiving 2008, M-L returned from the store with James and told her "Well, he's just being nice to me, because he's been molesting me." AR (2 VRP) at 213. Crockett then went into another room with M-L and James to discuss it. Crockett testified that M-L then told her that James had touched her on her side and on her leg. Then James began crying and admitted he touched M-L. Crockett did not focus on his explanation, but instead questioned

6

M-L about details. Crockett said that M-L denied James touching her breasts or vagina. Crockett

determined that the touching M-L had referred to was not molestation and there was no reason to

call the authorities. She also told James that he could not go into M-L's bedroom and M-L had to

ride in the backseat of the car if he drove her anywhere. She also frequently asked M-L if James

was touching her and M-L always said no.

> 5. ALJ's Findings and Conclusions

The ALJ's initial order affirmed the Department's findings of physical abuse and negligent

treatment and maltreatment. In the initial order, the ALJ made a detailed credibility finding which

found that M-L was credible and Crockett was not. Based on the credibility determination, the

ALJ found

> that it is more likely tha[n] not that the Appellant was aware in or about November 2008, that James Crockett was molesting or inappropriately touching [M-L] and that [M-L] suffered pain lasting more than one week after the physical altercation with the Appellant.

AR at 36.

III. REVIEW OF ALJ'S DECISION

Crockett appealed the ALJ's initial order to the review judge of the Department's Board of

Appeals. The review judge found, with regard to the August 2013 incident, that Crockett had a

confrontation with M-L, during which Crockett

> was going to strike M-L with her open hand. The Appellant then grabbed both of M-L's wrists with one hand and M-L's pony tail [sic] with the other hand and took M-L down to the floor. After she took M-L to the floor, she backed away and instructed M-L to bathe and go to bed.

AR at 5.

7

The review judge also found, with regard to the Thanksgiving 2008 disclosure, that M-L reported to Crockett that James had been molesting her, James initially denied the allegations but finally broke down and admitted to touching M-L, and Crockett never contacted the authorities regarding the molestation. And the review judge adopted the ALJ's credibility determination that M-L was credible and Crockett was not.

Based on the findings of fact, the review judge concluded that Crockett had committed physical abuse of a child on August 2013:

> Pursuant to these legal definitions and the hearing evidence, it is concluded that M-L was physically abused by the Appellant. The Appellant intentionally grabbed M-L by the hair and wrists and threw her to the ground, resulting in pain and marks on M-L's arm and wrist lasting a few days after the incident. Pursuant to the relevant legal authority, the intentional act of throwing M-L to the ground by her hair and wrists, resulting in pain and marks lasting a few days after the incident, is *specifically* defined as "physical abuse."

AR at 10 (footnote omitted). The review judge also concluded that Crockett's actions were not reasonable discipline:

> By reading WAC 388-02-009(1) and (2) together, in the context of RCW 26.44.020(1) and RCW 9A.16.100, it is evident that the actions set forth in WAC 388-15-009(1) are presumed to be physically abusive unless they are found to be reasonable and moderate disciplinary actions that fall within the exception set forth in WAC 388-15-009(2). Given that the Department proved that the Appellant engaged in one of the actions set out in WAC 388-15-009(1), the burden shifted to the Appellant to overcome the presumption of physical abuse by showing that her actions were reasonable and moderate discipline, in accordance with WAC 388-15-009(2). In this matter, M-L openly defied the Appellant, and the Appellant felt disrespected by M-L. However, refusing to drive to a doctor's appointment does not justify a hair and wrist "take-down" to the ground, resulting in pain and marks lasting a few days after the incident. Because this Appellant has failed to show that her abusive behavior was an attempt at reasonable and moderate discipline, her actions are not excused through the exception set forth in WAC 388-15-009(2).

AR at 11. And the review judge determined that Crockett committed negligent treatment or maltreatment because,

> The hearing evidence clearly demonstrated that this Appellant committed negligent treatment or maltreatment of her child by chronically failing to act on the knowledge that her daughter had been sexually molested, thereby creating a substantial risk of injury to the physical, emotional, and cognitive development of the child pursuant to WAC 388-15-009(5)(b). This Appellant was notified in November 2008, that her husband had been sexually molesting her child. However, in spite of this notification, the Appellant failed to notify the proper authorities, and instead decided to "*handle the situation as a family and pray*." On December 19, 2014, the Appellant's husband was convicted of four (4) counts of *Rape of a Child in the Second Degree*, for his actions against M-L. The Appellant's lack of appropriate action clearly demonstrated a serious disregard for her child's health and welfare, and created a clear and present danger to her child's safety. Therefore, it must be concluded that this Appellant committed negligent treatment or maltreatment of her daughter M-L, and the Department's Founded finding is affirmed.

AR at 12. Accordingly, the review judge affirmed the Department's findings.

Crockett appealed the review judge's final order to the superior court. The superior court affirmed the review judge's decision and denied Crockett's petition for judicial review.

Crockett appeals.

## ANALYSIS

A.    LEGAL PRINCIPLES OF REVIEW UNDER THE ADMINISTRATIVE PROCEDURE ACT (APA)

The Washington APA, chapter 34.05 RCW, governs judicial review of agency actions. *Crosswhite v. Dep't of Soc. & Health Servs.*, 197 Wn. App. 539, 547, 389 P.3d 731, *review denied*, 188 Wn.2d 1009 (2017). We review the final order of the Board of Appeals' review judge rather than the initial order by the ALJ or the superior court's order. *Verizon Nw., Inc. v. Employment Sec. Dep't*, 164 Wn.2d 909, 915, 194 P.3d 255 (2008). We will grant relief from an agency order only if one of nine statutory requirements is met.[4] RCW 34.05.570(3).

---

[4] RCW 34.05.570(3) provides,

Here, Crockett asserts that the review judge's order erroneously interprets and applies the law, is not supported by substantial evidence, and is arbitrary and capricious. RCW 34.05.570(3)(d), (3)(e), and (3)(i).[5] "The burden of demonstrating the invalidity of agency action is on the party asserting invalidity." RCW 34.05.570(1)(a).

We review findings of fact to determine whether, considering the record as a whole, the evidence is sufficient to persuade a fair minded person of the matter. *Spokane County v. E. Wash.*

---

The court shall grant relief from an agency order in an adjudicative proceeding only if it determines that:

　(a) The order, or the statute or rule on which the order is based, is in violation of constitutional provisions on its face or as applied;

　(b) The order is outside the statutory authority or jurisdiction of the agency conferred by any provision of law;

　(c) The agency has engaged in unlawful procedure or decision-making process, or has failed to follow a prescribed procedure;

　(d) The agency has erroneously interpreted or applied the law;

　(e) The order is not supported by evidence that is substantial when viewed in light of the whole record before the court, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this chapter;

　(f) The agency has not decided all issues requiring resolution by the agency;

　(g) A motion for disqualification under RCW 34.05.425 or 34.12.050 was made and was improperly denied or, if no motion was made, facts are shown to support the grant of such a motion that were not known and were not reasonably discoverable by the challenging party at the appropriate time for making such a motion;

　(h) The order is inconsistent with a rule of the agency unless the agency explains the inconsistency by stating facts and reasons to demonstrate a rational basis for inconsistency; or

　(i) The order is arbitrary and capricious.

[5]　It appears that Crockett is arguing that the order was arbitrary and capricious based on her argument challenging the review judge's credibility finding. Although she references the arbitrary and capricious standard in her "Legal Analysis" section, she does not provide any argument supporting that the order is arbitrary and capricious outside of her assertions challenging the review judge's credibility determination.

10

*Growth Mgmt. Hr'gs Bd.*, 176 Wn. App. 555, 565, 309 P.3d 673 (2013), *review denied*, 179 Wn.2d 1015 (2014). "The APA's directive that we review whether an order is supported 'by evidence that is substantial when viewed in light of the *whole record* before the court' requires us to look beyond whether there is merely some evidence that supports the agency order." *Crosswhite*, 197 Wn. App. at 548 (quoting RCW 34.05.570(3)(e)). We defer to the review judge's determination of witness credibility and weight of evidence. *Spokane County*, 176 Wn. App. at 565. And we review questions of law and the review judge's application of the law to the facts de novo. *Cornelius v. Dep't of Ecology*, 182 Wn.2d 574, 585, 344 P.3d 199 (2015).

B.    REVIEW OF CREDIBILITY DETERMINATIONS

First, Crockett asserts that we should disregard the review judge's credibility determination because it was not a "true" credibility finding. Br. of Appellant at 45. Based on this assertion, Crockett urges us to undertake an extensive review of the review judge's credibility determination and reject it. However, Crockett's argument misunderstands the review judge's authority and the limitations on our review.

Crockett bases her argument on the following italicized language from *Chandler v. Office of the Ins. Comm'r*, 141 Wn. App. 639, 657, 173 P.3d 275 (2007), *review denied*, 163 Wn.2d 1056 (2008):

> It is difficult to determine whether the review judge was justified in rejecting the ALJ's evaluation of Betty Husby's testimony. A review judge may substitute his or her findings for those of the ALJ, but she cannot reject credibility determinations without substantial evidence to the contrary in the record. While we cannot determine what documents Betty Husby signed or whether or not Chandler spoke to her in offensive terms during their interaction, we note that *the ALJ rejected her testimony because it was inconsistent, not because her demeanor was untrustworthy or unreliable. Like the review judge, we can look at the record to determine whether her testimony was substantively consistent. As such, the ALJ*

> *was not making a true credibility determination. We agree with the review judge that Ms. Husby's testimony was consistent throughout.* The ALJ rejected it for an unsupported reason, so the review judge could properly rely on it. Her testimony is substantial evidence of Chandler's improper conduct.

(emphasis added) (footnote omitted). Crockett reads this language to mean that, if a review judge's credibility determination is based on consistency or review of the record, we can review, and reject, the review judge's credibility determination. But, in light of the unique position of the review judge in an administrative review, this is an incorrect reading of the court's analysis in *Chandler*.

Unlike most bodies acting in a review capacity, the review judge has the authority, under the APA, to make his or her own factual findings based on the agency record. *Crosswhite*, 197 Wn. App. at 559; *Tapper v. Emp't Sec. Dep't*, 122 Wn.2d 397, 403-06, 858 P.2d 494 (1993). The review judge is only required to give "'due regard'" to the ALJ's opportunity to observe witnesses. *Chandler*, 141 Wn. App. at 650; RCW 34.05.464(4). And the review judge must provide an explanation if he or she intends to depart from any of the ALJ's findings, including credibility determinations. *Crosswhite*, 197 Wn. App. at 561. Such an explanation is necessary to allow a reviewing court to determine whether the review judge's findings, including the reason for deviating from the ALJ's findings, are supported by substantial evidence. *See Id*. at 561; *Chandler*, 141 Wn. App. at 650, 657.

Then, we review the review judge's findings of fact within the limits of judicial review provided by the APA. RCW 34.05.570(3). In cases in which the review judge rejected findings or credibility determinations made by the ALJ, it is within the scope of our judicial review to determine whether the review judge's deviation from the ALJ's finding was supported by substantial evidence and whether the review judge properly applied the statutory standard of "due

regard" to the ALJ's opportunity to observe witnesses. RCW 34.05.464(4); *See also Crosswhite*, 197 Wn. App. at 559-61; *Chandler*, 141 Wn. App. at 655-57. This is the context in which the court was analyzing the credibility determination in *Chandler*.

Here, the reviewing judge *adopted* the ALJ's credibility finding, it did not reject it.[6] Therefore, there is no conflict to resolve between the review judge's final order and the ALJ's initial order. If we took the approach advocated by Crockett, we would not be determining whether the review judge's reasons for rejecting the ALJ's finding was supported and appropriate, which is within the scope of judicial review and was done in *Chandler*. RCW 34.05.570(3); *Chandler*, 141 Wn. App. at 655-57. Instead, we would be reweighing the evidence and substituting our own credibility determinations for those of the review judge, which is outside the scope of judicial review. RCW 34.05.570(3); *Spokane County*, 176 Wn. App. at 565. Therefore, we will not review the reviewing judge's credibility determination and instead defer to the review judge's findings.

C.     SUBSTANTIAL EVIDENCE

1.      August 2013 Incident

Crockett argues that substantial evidence does not support the review judge's findings relating to the August 2013 incident because there was no evidence Crocket threw M-L to the ground or that M-L suffered pain or injury to her wrist as a result of the incident. We disagree.

---

[6] Crockett notes that the review judge removed the following language from the ALJ's finding, "I carefully considered and weighed all of the evidence, including witness demeanor (as determined by voice, attitude, reasonableness, and consistency of testimony throughout the hearing), the motivation of each party, and the totality of the circumstances presented." Br. of Appellant at 46. Crockett asserts this shows that the finding is not a credibility finding. However, the language was more likely removed because the review judge did not observe the witnesses and a finding claiming he did would be improper.

The review judge made the following findings of fact related to the August 2013 incident,

16.     In August 2013, M-L and the Appellant got into an altercation because M-L told James that she was not going to drive her mother to a doctor's appointment that week.

17.     The Appellant grabbed M-L's wrists during the altercation. M-L's wrist was sore for approximately a week and a half after the altercation. There were marks on M-L's arm and wrist after the altercation that lasted a few days.

18.     Specifically, on August 18, 2013, M-L, the Appellant, and the other child drove to a track to go for a walk. M-L was driving the car and the Appellant was providing driving instruction. During the instruction, there was a disagreement between M-L and the Appellant. M-L got out of the car and the Appellant had to finish parking the car. After the walk, the Appellant drove the car back home. At some point after M-L and Appellant came home, M-L informed James that she was not going to drive the Appellant to her doctor's appointment in the coming days. Soon-there-after, James informed the Appellant that M-L told him she wouldn't be driving the Appellant to the appointment. Once informed that M-L indicated her unwillingness to drive the Appellant to the doctor's appointment, the Appellant proceeded to go downstairs to confront M-L. During the confrontation, the Appellant informed M-L that M-L was not in a position to tell people what she was or was not going to do. The Appellant felt disrespected by M-L. During the confrontation, the Appellant was going to strike M-L with her open hand. The Appellant then grabbed both of M-L's wrists with one hand and M-L's pony tail [sic] with the other hand and took M-L down to the floor. After she took M-L to the floor, she backed away and instructed M-L to bathe and go to bed.

19.     The Appellant did not notice any marking or bruising on M-L's wrists.

AR at 5.

These findings are consistent with the testimony provided by both M-L and Crockett regarding the actual physical contact that Crockett used towards M-L during the incident. M-L testified that Crockett hit her during their altercation and Crockett injured her wrist when Crockett grabbed her arm. Crockett testified that during the altercation with M-L, she grabbed M-L's wrists and ponytail and "put her on the floor." AR (3 VRP) at 28. Crockett also characterized the

maneuver as a take down. And the review judge adopted Crockett's characterization of a take down rather than a throw. AR at 5 (The appellant "took M-L down to the floor."). Accordingly, these findings are supported by substantial evidence.

The review judge also found that, based on credibility determinations, it was more likely than not that M-L suffered pain lasting more than a week. This finding is also supported by substantial evidence in the record. M-L specifically testified that her wrist was discolored and aching for a couple of days. And Detective Brooks and Campbell testified that M-L had stated her wrist hurt for over a week. Crockett only testified that she did not see any visible injury to M-L after the altercation. That testimony does not undermine the likelihood that M-L was in pain from an aching wrist for over a week. Therefore, a review of the record as a whole supports the review judge's finding.

### 2. Thanksgiving 2008 Disclosure

Crockett argues that the review judge's findings regarding the Thanksgiving 2008 disclosure were not supported by substantial evidence because M-L did not disclose that she was inappropriately touched, molested, or sexually abused.

The review judge made the following findings of fact regarding the disclosures that M-L made to Crockett on Thanksgiving 2008:

> 10. M-L had reported to the Appellant during Thanksgiving Day 2008, that she couldn't be expected to respect James when he doesn't respect her and he had been molesting her. She indicated that James had been touching her over her clothes.

> 11. Specifically, on Thanksgiving Day 2008, when M-L was approximately 12 years old, James took M-L and the Appellant's other child to the store. When they returned from the store, M-L came in and told the Appellant she had been molested.

12.     M-L, the Appellant, and James went to a different area of the house to discuss what M-L had disclosed to the Appellant. The Appellant, M-L, and James discussed M-L's disclosure for approximately 1.5-2 hours. During the discussion, the Appellant pressed M-L for specific details while James was present. The Appellant then questioned James and he initially denied the allegations. The Appellant continued to ask James about touching M-L. He finally broke down, began crying, and admitted to touching M-L. During the period James was crying the Appellant did not hear or recall what he was saying. James offered or attempted to call the police and report himself during this discussion, but the Appellant prevented him from doing so.

13.     When M-L was summoned back into the room, the Appellant reported to M-L that they were going to handle the situation as a family and pray. M-L was also offered the opportunity to go to counseling. Neither the Appellant, nor James, ever contacted any authorities regarding the molestation.

AR at 4.

These findings are supported by the evidence that was presented at the hearing. In fact, these findings are consistent with both Crockett's and M-L's testimony regarding the discussion that occurred on Thanksgiving 2008.

Crockett's dispute is actually with the review judge's finding that it is more likely than not that Crockett "was aware that James was molesting or inappropriately touching M-L since November 2008." AR at 7. This finding is also supported by substantial evidence. M-L testified that she told Crockett that James molested her and after further discussions, she disclosed that James had touched her over her clothes. M-L also testified that she told Crockett that James touched her breasts and vagina. Detective Brooks and Campbell also recalled that M-L told them that she had told Crockett that James was molesting her and described some of the touching. Because the ALJ and the review judge found that M-L was credible, and the whole of the record

16

supports the finding, there was substantial evidence to support the finding that Crockett knew James had molested M-L since M-L's disclosure on Thanksgiving 2008.

Substantial evidence supports the review judge's findings related to the August 2013 incident and the Thanksgiving 2008 disclosure. Therefore, Crockett's sufficiency challenge to the review judge's findings fails.

D.      ERRORS OF LAW

1.      Physical Abuse

RCW 26.44.020(1) defines child abuse:

"Abuse or neglect" means sexual abuse, sexual exploitation, or injury if a child by any person under circumstances which cause harm to the child's health, welfare, or safety, excluding conduct permitted under RCW 9A.16.100; or the negligent treatment or maltreatment of a child by a person responsible for or providing care to the child. An abused child is a child who has been subjected to child abuse or neglect as defined in this section.

And former WAC 388-15-009(1) (2007)[7] goes on to further define physical abuse:

Physical abuse means the nonaccidental infliction of physical injury or physical mistreatment on a child. Physical abuse includes, but is not limited to, such actions as:
        (a) Throwing, kicking, burning, or cutting a child;
        (b) Striking a child with a closed fist;
        (c) Shaking a child under age three;
        (d) Interfering with a child's breathing;
        (e) Threatening a child with a deadly weapon;
        (f) Doing any other act that is likely to cause and which does cause bodily harm greater than transient pain or minor temporary marks or which is injurious to the child's health, welfare or safety.

---

[7] In 2018, WAC 388-15-009 was recodified as WAC 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, but the relevant language has remained substantively unchanged since 2007.

However, an exception is provided for reasonable physical discipline of child. Former WAC 388-15-009(2). Former WAC 388-15-009(2) provides,

> Physical discipline of a child, including the reasonable use of corporal punishment, is not considered abuse when it is reasonable and moderate and is inflicted by a parent or guardian for the purposes of restraining or correcting the child. The age, size, and condition of the child, and the location of any inflicted injury shall be considered in determining whether the bodily harm is reasonable or moderate. Other factors may include the developmental level of the child and the nature of the child's misconduct. A parent's belief that it is necessary to punish a child does not justify or permit the use of excessive, immoderate or unreasonable force against the child.

The review judge concluded that Crockett committed physical abuse of a child based on the August 2013 incident because she caused "pain and marks" to M-L's wrist that lasted for a few days after the incident. AR at 10. And the review judge concluded that Crockett's actions were not reasonable discipline.

Crockett appears to argue that because nobody saw any visible injury to M-L's wrist, then the injury could not be severe enough to meet the definition of physical abuse. However, the definition of physical abuse includes "bodily harm greater than transient pain." Former WAC 388-15-009(1)(f). The definition does not require visible injury in order to sustain a finding that physical abuse occurred. Therefore, the review judge did not erroneously interpret or apply the law by concluding that the pain in and marks on M-L's wrists resulting from Crockett grabbing her was sufficient to show physical abuse because the pain and marks lasted for a few days.

Crockett also appears to argue that the review judge erred by concluding that Crockett threw M-L during the altercation. Although the review judge uses the word "threw" in the conclusion, the review judge also repeatedly refers to the incident as a take down. And the review judge clearly concluded Crockett's actions were physical abuse under WAC 388-12-009(1)(f)

18

based on the pain that resulted to M-L's wrist and not under WAC 388-15-009(1)(a) which defines physical abuse as throwing, kicking, burning, or cutting a child. Therefore, the review judge's isolated use of the term "threw" in the conclusion does not show that the review judge erroneously interpreted or applied the law.

Crockett further argues that the review judge erroneously interpreted or applied the law because the take down maneuver that Crockett used was reasonable and moderate discipline in light of M-L's behavior during the altercation. But the review judge made no findings consistent with Crockett's characterization of M-L's behavior during the altercation. Although Crockett testified that M-L was hysterical and angry, even attempting to attack her, the review judge did not find that M-L was behaving in this manner. And because the review judge did not find Crockett's testimony to be credible, the review judge adopted M-L's version of the altercation, which he did find to be credible.

Here, the review judge did not erroneously interpret or apply the law by determining that it was unreasonable for Crockett to respond to verbal disobedience and disrespect by escalating the confrontation into a physical altercation and a take down. Crockett has cited no findings or authority that would require reaching a contrary result. Furthermore, even if some level of physical discipline may have been reasonable or appropriate in this situation, the physical discipline that Crockett chose to employ—a physical take down—resulted in pain in and marks on M-L's wrist that lasted for a few days. Therefore, the amount of force that Crockett used was not moderate. We affirm the review judge's conclusion that Crockett physically abused M-L by taking her to the ground and causing pain in her wrist that lasted several days. Accordingly, the Department's founded finding for physical abuse is affirmed.

    2.        Negligent Treatment or Maltreatment

Negligent treatment or maltreatment is defined by RCW 26.44.020. Former RCW

26.44.020(16) (2012) states, in relevant part,

> "Negligent treatment or maltreatment" means an act or failure to act. . . that evidences a serious disregard of consequences of such magnitude as to constitute a clear and present danger to a child's health, welfare, or safety, including but not limited to conduct prohibited under RCW 9A.42.100.

The Department has adopted a regulation providing further clarification of the definition

of negligent treatment or maltreatment, Former WAC 388-15-009(5) which provides,

> Negligent treatment or maltreatment means an act or a failure to act, or the cumulative effects of a pattern of conduct, behavior, or inaction, on the part of a child's parent, legal custodian, guardian, or caregiver that shows a serious disregard of the consequences to the child of such magnitude that it creates a clear and present danger to the child's health, welfare, or safety. A child does not have to suffer actual damage or physical or emotional harm to be in circumstances, which create a clear and present danger to the child's health, welfare, or safety. Negligent treatment or maltreatment includes, but is not limited, to:
>    (a) Failure to provide adequate food, shelter, clothing, supervision, or health care necessary for a child's health, welfare, or safety. Poverty and/or homelessness do not constitute negligent treatment or maltreatment in and of themselves;
>    (b) Actions, failures to act, or omissions that result in injury to or which create a substantial risk of injury to the physical, emotional, and/or cognitive development of a child; or
>    (c) The cumulative effects of a pattern of conduct, behavior or inaction by a parent or guardian in providing for the physical, emotional and developmental needs of a child's, or the effects of chronic failure on the part of a parent or guardian to perform basic parental functions, obligations, and duties, when the result is to cause injury or create a substantial risk of injury to the physical, emotional, and/or cognitive development of a child.

Here, the review judge concluded that Crockett committed negligent treatment or

maltreatment under former WAC 388-15-009(5)(b). The review judge also concluded that

Crockett committed negligent treatment or maltreatment of a child because she failed to report M-

20

L's allegations of sexual abuse and her lack of appropriate action created a clear and present danger to M-L's safety.

Crockett argues that she could not have committed negligent treatment or maltreatment because, after questioning M-L and discussing the situation, she determined that M-L had not been sexually abused and then proceeded to institute a safety plan that prevented any further sexual abuse or inappropriate contact between M-L and James. Crockett supports this argument by demonstrating that she was not a mandated reporter and, therefore, had no legal obligation to report allegations of abuse. We reject this argument.

Here, the review judge's findings of fact, supported by substantial evidence as explained above, supports the conclusion that Crockett disregarded consequences to the child of such magnitude that it creates a clear and present danger to the child's health, welfare, or safety. Crockett knew that James molested M-L, and she allowed M-L to continue living in the same house with her abuser. Even though she took some measure by instituting safety rules, those rules did not eliminate the risk that M-L could be molested again. And Crockett completely disregards the emotional harm that could result from continuing contact with an abuser.[8] Therefore, we affirm the review judge's conclusion that Crockett committed negligent treatment or maltreatment.

---

[8] We also reject Crockett's argument that parents have no obligation to report allegations of abuse their children make and are free to exercise their own personal judgment in how to deal with the situation. Crockett's argument would allow parents to cover up all sorts of abuses. While parents may not be legally obligated to report as statutory mandated reporters, parents have an inherent duty and obligation to protect their children and to act in their best interests and, as such, parents should be required to make appropriate disclosures to the relevant authorities when their children make allegations of abuse.

No. 52541-1-II

APPELLATE ATTORNEY FEES

Crockett requests attorney fees on appeal under RAP 18.1 and RCW 4.84.350(1). RAP 18.1 allows us to award attorney's fees if the party requesting attorney's fees is entitled to attorney's fees under applicable law. RCW 4.84.350(1) provides,

> Except as otherwise specifically provided by statute, a court shall award a qualified party that prevails in a judicial review of an agency action fees and other expenses, including reasonable attorneys' fees, unless the court finds that the agency action was substantially justified or that circumstances make an award unjust. A qualified party shall be considered to have prevailed if the qualified party obtained relief on a significant issue that achieves some benefit that the qualified party sought.

Here, we affirm the review judge's final order. Therefore, Crockett is not the prevailing party and she is not entitled to attorney fees under RCW 4.84.350(1).

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, J.

We concur:

Maxa, C.J.

Melnick, J.

22